**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | **2:15-cv-835** |
| v. | ) ) | |
| B & G ABSTRACTORS, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Pending before the Court is the MOTION TO DISMISS AMENDED COMPLAINT, along with a brief in support, filed by Defendant, B&G Abstractors, Inc. (ECF Nos. 18, 19). Plaintiff, Fidelity National Title Insurance Company, has filed a brief in opposition to the motion. (ECF No. 22). Defendant has filed a reply brief. (ECF No. 23). Accordingly, the motion is ripe for disposition.

### I.      Factual Background

The following background is drawn from the Amended Complaint and exhibits attached thereto.[1] As the law requires, the factual allegations therein are accepted as true, and all disputed facts and inferences are resolved in favor of Plaintiff, the non-moving party.

#### A.      The Parties

Plaintiff "is a title insurance underwriter whose primary business is underwriting title insurance policies insuring owners and lenders against certain adverse claims or risks, subject to the terms and conditions of the policies." Am. Compl. ¶ 1, ECF No. 17. Defendant "is a title insurance policy issuing agency[.]" *Id.* ¶ 2.

---

1.      Plaintiff has attached the following exhibits to the Amended Complaint: the Agency Agreement (ECF No.17-1); the Financing Proposal from LaSalle Bank to Zambrano Condo (ECF No. 17-2); the Loan Policy of Title Insurance (ECF No. 17-3); and a Howard Hanna news release announcing the opening of the Marbella on-site sales center (ECF No. 17-4).

## B.    <u>The Agency Agreement</u>

Representatives of Plaintiff and Defendant signed an Issuing Agency Agreement dated January 13, 2003. *Id.* ¶ 7. Under the Agency Agreement, Defendant was appointed "'solely to countersign and issue title insurance commitments, binders, guarantees, endorsements, [and] title insurance policies of [Fidelity National]' within [its] assigned Territory." *Id.* ¶ 8 (quoting Agency Agreement ¶ 1, ECF No. 17-1). The Agency Agreement requires Defendant to "[r]eceive and process applications for Title Assurances in accordance with the provisions of state law, in conformity with the usual and customary practices and procedures, prudent underwriting principles and in full compliance with manuals, instructions, and bulletins of [Plaintiff] from time to time given to [Defendant]." *Id.* ¶ 8 (quoting Agency Agreement ¶ 2). The Agency Agreement further provides that "[i]n the event that a Loss sustained or incurred for a matter arising under this Agreement resulted or arose from the negligent, willful or reckless conduct of [Defendant], . . . then [Defendant] shall reimburse [Plaintiff] for the Loss." Agency Agreement ¶ 6(B). The Agency Agreement includes a non-exclusive list of "instances where [Defendant] shall be liable to [Plaintiff] under this subparagraph," including:

1. Failure of [Defendant] to comply with the terms and conditions of this Agreement or with the manuals, underwriting bulletins and/or instructions given to [Defendant] by [Plaintiff].

2. Issuance of Title Assurances which contain errors or omissions which could reasonably have been detected by [Defendant] from the commitment, examiner's report, title search or abstract.

3. Loss arising from escrow or Non-Title Assurance operations of [Defendant] including, but not limited to, preparation of documents, providing abstracting services, providing accommodation services and the handling and disbursement of funds.

4. Any Loss arising out of the Issuance of an insured closing service letter naming [Defendant].

5.      Commission of fraud, conspiracy, dishonesty, misrepresentation or defalcation by [Defendant] or [Defendant's] aiding and abetting therein.

6.      Any act, or failure to act, of [Defendant] which results in [Plaintiff] sustaining Loss or bad faith, deceptive trade practices, unfair claim practices, consumer protection violations or punitive damages.

*Id.* ¶ 6(B)(1)-(6). The Agency Agreement defines "Loss" as "sums paid or to be paid by [Plaintiff], in cash or otherwise, to settle or compromise claims under any of [Plaintiff's's] Title Assurances issued by [Defendant]," including "expenses, costs and attorney's fees actually paid or incurred in connection with investigation, negotiation, litigation, or settlement of such claim which ultimately requires payment of any sum by [Plaintiff]." *Id.* ¶ 12(A).

## C.      <u>Marbella at Chapel Harbor Development</u>

On February 15, 2006, Zambrano Condominium Associates, LP ("Zambrano Condo"), obtained a construction loan for $22,523,750.00 from LaSalle Bank, N.A., to finance a condominium development called Marbella at Chapel Harbor. Am. Compl. ¶ 9. The loan was secured by an open-end mortgage that was recorded on March 20, 2006. *Id.* As a condition of securing the loan, "LaSalle Bank required Zambrano Condo to obtain a title insurance binder[.]" *Id.* ¶ 10. "LaSalle Bank further required . . . that Zambrano Condo commence construction on the project before December 31, 2005." *Id.* ¶ 11. "B&G and its affiliated entities acted for multiple entities in [the] mortgage loan transaction, including the borrower (Zambrano Condo), the general contractor (Zambrano Corporation), which was an affiliate of the borrower, and two of the subcontractors who later asserted mechanics lien claims – in addition to acting as policy issuing agent for Fidelity National." *Id.* ¶ 12.

In connection with the closing of the loan, Defendant issued LaSalle Bank "a lender's policy of title insurance number 5414-3221 (the 'Policy'), underwritten by Fidelity National[.]" *Id.* ¶13. "The Policy insures the priority of the insured lender's mortgage lien over any other lien

or encumbrance upon the Property that is not expressly excepted by the Policy." *Id.* Because of the amount of the loan, Defendant was required to obtain Plaintiff's prior approval before issuing the title coverage. *Id.* ¶ 15. Such approval was sought in mid-January 2006. *Id.* Plaintiff "conditioned its approval . . . upon receipt from B&G of 'a statement that there is no mechanics' lien issue, or if there is, what is being suggested to do about it.'" *Id.* ¶ 16. Defendant responded that "'[t]here better not be a mechanics' lien issue. Our firm did the No Lien Agreement.'" *Id.* ¶ 17. "Based upon the foregoing representation by B&G, and believing in good faith that B&G had taken all steps necessary to assure that there was no evidence of the visible commencement upon the ground of the work of erecting or constructing the improvement thereon, [Plaintiff] gave approval for a title insurance commitment in the loan amount, subject to no exceptions for mechanics liens."[2] *Id.* ¶ 18.

"However, unbeknownst to Fidelity National," when it "approve[d] the title insurance commitment for the construction loan, construction work on Marbella at Chapel Harbor had already visibly commenced." *Id.* ¶ 19. In a press release dated October 26, 2005, Howard Hanna Real Estate Services and Zambrano Corporation, the contractor, "'celebrated' 'the newly opened Howard Hanna On-Site Sale Center and the construction start of MARBELLA, the "crown jewel" of Chapel Harbor[.]'" *Id.* (quoting Howard Hanna Press Release, ECF No. 17-4). According to the press release and as confirmed by aerial photos of the site, construction on the project had already begun. *Id.* Plaintiff alleges, "[u]pon information and belief," that B&G knew or should have known that construction had "visibly commenced and that all mechanics liens

---

2. "Under Pennsylvania law in 2006, mechanics liens take priority 'as of the date of the visible commencement upon the ground of the work of erecting or constructing the improvement[.]'" Am. Compl. ¶ 14 (quoting 49 P.S. § 1508). "Under the law," Plaintiff avers, "mechanics liens claims have priority over a mortgage holder, when visible commencement of the work, by any person or entity, occurred prior to the recording of the mortgage." *Id.* (citing *Sec. Bank and Trust Co. v. Pocono Web Press, Inc.*, 441 A.2d 1321, 1324 (Pa. Super. Ct. 1982)).

would therefore have priority over the lien of the Mortgage" because of its relationship with Zambrano Corporation and Zambrano Condo. *Id.* ¶ 20. However, when Plaintiff asked "about mechanics lien issues, B&G did not disclose to [Plaintiff] what it knew or should have known about the commencement of construction." *Id.*

Plaintiff alleges that Defendant, which was "[a]cting as a policy issuing agent for Fidelity National and as the closing agent for the loan," was required "to make appropriate inquiries to assure itself and [Plaintiff] that construction at the Property had not visibly commenced prior to issuing the title commitment" and then convey "what it knew or should have known in that regard" to Plaintiff. *Id.* ¶ 21. Plaintiff alleges, however, that "[Defendant] did not inspect the Property or make inquiries or take other steps to assure that there was no evidence of the visible commencement upon the ground of the work of erecting or constructing the improvement prior to issuing the title commitment." *Id.* ¶ 23. Defendant also failed to "except mechanics' liens from coverage under the Policy." *Id.* "As a direct result," Plaintiff alleges, "the insured lender and [Plaintiff] were directly and unknowingly exposed to the risk of loss arising from the mechanics liens of all unpaid subcontractors and material men, all of whom would have priority over the insured Mortgage." *Id.*

Plaintiff alleges that if it had "been told by [Defendant], prior to giving its approval, that construction had visibly commenced, [it] would not have approved the issuance of a title insurance commitment without express exception for all mechanics liens and an Indemnification Agreement relative to mechanics' lien claims from Zambrano Condo, and/or the principal(s) of Zambrano Condo, and/or Zambrano Corporation, supported by financial statements and other documentation sufficient to demonstrate, to [Plaintiff's] satisfaction, the financial strength of the prospective indemnitor to support the obligations under the Indemnification Agreement[.]" *Id.* ¶

24. Plaintiff further alleges that it would have required the following additional "controls and safeguards" had it known that work on the project had already visibly commenced: "a requirement that date down searches be performed" before "each draw request against the construction loan, to verify that no mechanics' had been filed of record; and/or a requirement that the subcontractors who provided labor or materials to the project during the relevant period be paid from each requested draw and provided lien releases in consideration of the payments received; and/or additional controls, according to the risk specific to the project, as assessed by [Plaintiff]." *Id.* ¶ 24(a)-(c). Without those "controls and safeguards," Plaintiff claims that it "would not have approved the title insurance commitment." *Id.* ¶ 25. Furthermore, Plaintiff asserts, "[i]f those controls and safeguards had been implemented," its losses "would have been entirely avoided, or substantially mitigated." *Id.*

On March 17, 2006, Defendant's "affiliate Blumling & Gusky, LP, acting as counsel for Zambrano Condo and for Zambrano Corp." filed a Waiver of Liens with the Allegheny County Prothonotary's Office, "which purported to [sic] 'to waive all mechanics lien rights on behalf of [the Contractor], its subcontractors and materialmen, and any other parties claiming by through or under it or any of them or under the contract.'"[3] *Id.* ¶ 26. According to Plaintiff, however, "[o]btaining a Waiver of Liens did not satisfy or nullify B&G's contractual duty and responsibility to make appropriate inquiries to assure itself and [Plaintiff] that construction at the

---

3.     As both parties acknowledge, the law of mechanics' liens in Pennsylvania has been in a state of flux over the past decade. Under the Mechanics Lien Law of 1963, "every improvement and the estate or title of the owner in the property" is subject to a lien "for the payment of all debts due by the owner to the contractor or by the contractor to any of his subcontractors for labor or materials . . . ." 49 P.S. § 1301. Historically, general contractors, prior to commencing construction, were allowed to independently waive the lien rights of subcontractors in an agreement with the property owner, provided the subcontractors had either actual or constructive notice of the waiver agreement. *See Floors, Inc. v. Altig*, 963 A.2d 912, 917 (Pa. Super. Ct. 2009). In 2006, however, the Pennsylvania General Assembly amended the Mechanics Lien Law to provide that a contractor may not waive a subcontractor's lien rights unless it has posted a bond. 49 P.S. § 1402(a). Otherwise, "[a] waiver by a contractor of a subcontractor's lien rights is unlawful[.]" *Brubacher Excavating, Inc. v. Commerce Bank/Harrisburg, N.A.*, 995 A.2d 362, 367 (Pa. Super. Ct. 2010). The amendment "appl[ies] to contracts entered into on or after January 1, 2007." *Id.* (citing 49 P.S. § 1401 (Historical and Statutory Notes)). Thus, the Waiver of Liens in this case applies only to those subcontractor agreements signed before January 1, 2007, but it is void with respect to all agreements signed thereafter. *See id.*

Property had not visibly commenced prior to recording of the Mortgage; and to disclose to [Plaintiff] what it knew or should have known in that regard." *Id.* ¶ 27. "Obtaining the Waiver of Liens and nothing more," Plaintiff continues, "was not adequate to protect the first priority position of the insured Mortgage, nor was it in conformity with usual and customary practices and procedures for a title agent." *Id.* ¶ 27.

LaSalle Bank issued its first loan disbursement to Zambrano Condo on December 8, 2006, in the $2,699,894.35 – $2,000,000.00 of which Zambrano Condo used to pay off two prior mortgages on the property. *Id.* ¶¶ 30, 31.

**D.  The Foreclosure Proceedings**

On February 4, 2009, following a default by Zambrano Condo, Bank of America, LaSalle Bank's successor in interest to the Mortgage, initiated foreclosure proceedings in the Court of Common Pleas of Allegheny County. *Id.* ¶ 33. A judgment of foreclosure was entered against Zambrano Condo on March 4, 2010, for $21,801,550.89 plus interest. *Id.* ¶ 34. Bank of America subsequently assigned its interest to Shaner Capital, L.P., which, in turn, became the insured under the Policy. *Id.* ¶ 35. Eventually, 14 subcontractors filed mechanics' lien claims against Zambrano Condo, totaling $3,423,228.92, and intervened in the foreclosure action to determine the priority of their liens vis-à-vis the Mortgage. *Id.* ¶¶ 36-37. On March 28, 2011, Shaner Capital filed a notice of claim under the Policy, and Plaintiff accepted coverage and retained counsel to represent Shaner Capital in the priority dispute. *Id.* ¶ 38.

Alleging that work had visibly commenced at the Property "on or before October 26, 2005," the mechanics lien claimants argued that "their liens . . . had priority over the lien of the insured Mortgage." *Id.* ¶ 39. "Discovery taken in the Foreclosure Action confirmed that work had been visibly commenced prior to the recording of the Mortgage." *Id.* ¶ 40. In addition to the

aforementioned press release, "Eugene D. Zambrano, III, former President of Zambrano Corp. and sole member of Zambrano Condo," testified in a deposition about "clearing, grubbing and test borings at the Marbella at Chapel Harbor construction site which occurred before the recording of the Mortgage." *Id.* "Mr. Zambrano and Zambrano Condo were represented at that deposition by Blumling & Gusky, L.P." *Id.*

### E.    Settlement of the Mechanics' Lien Claims

On July 7, 2011, "pursuant to its rights and obligations under the Policy, Fidelity National settled and secured discharge of the liens of two of the Mechanics' Lien Claimants": Carpenters Combined Funds, Inc., which was paid $37,990.50; and Laborers Combined Funds of Western Pennsylvania. *Id.* ¶ 41. Plaintiff alleges, "[u]pon information and belief," that these "two mechanics liens . . . arose from contracts entered into before the Waiver of Liens was recorded by Defendant and therefore those liens would not have been affected by the Waiver of Liens." *Id.* ¶ 42. "[W]ith respect to the twelve remaining Mechanics' Lien Claimants, Fidelity National caused Shaner Capital's appointed counsel to argue in the Foreclosure Action that those Claimants' mechanics liens were governed by the exception for 'open end mortgages' set forth in the 2006 Amendments to the Pennsylvania Mechanics Lien Law, codified at 49 P.S. § 1508(c)(2)." *Id.* ¶ 44. On August 11, 2011, the Court of Common Pleas of Allegheny County ruled that the Mortgage had priority over the 12 remaining mechanics' liens, under the exception for open-end mortgages. *Id.* ¶ 45. Three of the subcontractors appealed that ruling to the Pennsylvania Superior Court. *Id.* ¶ 46. While the appeal was pending, the Pennsylvania Superior Court held in another case, *Commerce Bank/Harrisburg, N.A. v. Kessler*, 46 A.3d 724 (Pa. Super. Ct. 2012), that the open-end mortgage exception can only be invoked if the loan secured by the mortgage is used entirely for construction. *Id.* ¶ 47. In light of *Kessler*, the Superior Court

remanded the Foreclosure Action to the Court of Common Pleas to determine whether the insured's mortgage had been used entirely for construction. *Id.* ¶ 48.

Because Zambrano Condo had used part of the loan proceeds to satisfy prior liens "and because the discovery made clear that the mechanics liens would have priority over the Mortgage by virtue of the commencement of construction prior to recording of the Mortgage, [Plaintiff] concluded that it would face a substantial liability if the priority dispute between its insured's Mortgage and the liens of the remaining Mechanics' Lien Claimants proceeded to final disposition." *Id.* ¶ 49. As a result, Plaintiff "accelerated settlement discussions with the remaining Mechanics' Lien Claimants" and secured discharge of each of their liens. *Id.* ¶ 50. In total, Plaintiff paid $893,850.00 in settlement of the liens and incurred attorney's fees and expenses in the Foreclosure Action totaling $127,238.22. *Id.* ¶ 51.

## II.  **Procedural History**

Plaintiff initiated this action with the filing of a two-count Complaint on June 24, 2015. (ECF No. 1). Defendant responded by filing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Plaintiff's putative breach of contract claim was actually a claim for professional negligence and, in turn, failed to state a claim. (ECF No. 13). On September 11, 2015, Plaintiff filed an Amended Complaint instead of responding to the motion to dismiss. (ECF No. 16).

In Count I of the Amended Complaint, Plaintiff asserts a claim for breach of contract. More specifically, Plaintiff avers that "B&G agreed in ¶6B of the Agency Agreement to indemnify [Plaintiff] for any 'Loss sustained or incurred for a matter arising under this Agreement [that] resulted or arose from the negligent, willful, or reckless conduct of [B&G], B&G's employees, or [any] independent contractors relied upon by [B&G].'" Am. Compl. ¶ 55 (quoting Agency Agreement ¶ 6(B)). According to Plaintiff, "[t]he sums paid . . . to the

Mechanics' Lien Claimants totaling $893,950.00 are Losses within the meaning of ¶12 of the Agency Agreement." *Id.* ¶ 57. So too are "[t]he expenses, costs and attorney's fees paid by [Plaintiff] in connection with litigation, negotiation and settlement with the Mechanics' Lien Claimants, totaling $127,238.22[.]" *Id.* ¶ 58. All of the aforesaid losses, Plaintiff alleges, fall within the scope of paragraph 6 the Agreement. *Id.* ¶ 59. Defendant, however, has refused to reimburse Plaintiff, which Plaintiff claims constitutes a breach of "¶6B of the Agency Agreement." *Id.* ¶¶ 60-61. Plaintiff also claims that it is entitled to recover court costs and attorneys' fees incurred in pursuing this action, in accordance with paragraph 9 of the Agency Agreement. *Id.* ¶¶ 63-64.

In Count II, Plaintiff pleads, in the alternative, that "if the Court determines that the parties' express contract does not require indemnification . . . then the Court may consider whether indemnification is nonetheless appropriate under the doctrine of common law indemnification. *Id.* ¶ 66. "Accordingly," Plaintiff alleges, "B&G was primarily and actively responsible for the failure to determine that work at the construction site had visibly commenced before the insured Mortgage was recorded, which failure placed the first priority of the lien of the insured Mortgage in jeopardy and led directly to the above-described Losses." *Id.* ¶ 67.

## III. <u>Legal Standard</u>

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for the "failure to state a claim upon which relief can be granted." Upon review of a motion to dismiss for failure to state a claim, the Court must accept all well-pleaded facts and allegations as true and draw all reasonable inferences in favor of the plaintiff. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)). However, as the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly*, such "[f]actual

allegations must be enough to raise a right to relief above the speculative level." 550 U.S. 554, 555 (2007).

The Supreme Court later refined this approach in *Ashcroft v. Iqbal*, emphasizing the requirement that a complaint must state a plausible claim for relief in order to survive a motion to dismiss. 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555). "[T]he plausibility standard is not akin to a 'probability requirement,'" but requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 555).

To determine the legal sufficiency of a complaint after *Twombly* and *Iqbal,* the Court of Appeals for the Third Circuit requires district courts to follow a three-step approach. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010) (citing *Iqbal*, 556 U.S. at 675). First, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675) (alteration in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Accordingly, the Court must separate the factual and legal elements of the claim and "accept the factual allegations contained in the Complaint as true, but [] disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-57; *Burtch*, 662 F.3d at 220-21). The Court "must then determine whether the facts alleged in the

complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal* 556 U.S. at 678). The "complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id.* Determining "plausibility" is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

## IV.    Discussion

Defendant makes a multifaceted argument in support of its motion to dismiss. To begin, Defendant argues that under Pennsylvania's gist of the action doctrine, Count I is not actually a breach of contract claim, as Plaintiff alleges. Instead, according to Defendant, it sounds in tort – particularly the realm of professional negligence. And when recast in that manner, Defendant says that Count I fails to state a claim upon which relief may be granted since Defendant discharged any duty to Plaintiff by filing the Waiver of Liens and cannot be found negligent for failing to predict the change in Pennsylvania law regarding the effectiveness of the Lien Waiver. Defendant also argues that Count I fails because (1) Plaintiff failed to file a certificate of merit ("C.O.M."), as required by Pa. R.C.P. 1042.3 in certain actions involving professional negligence; and (2) the action is time-barred under Pennsylvania's two-year statute of limitations for tort claims. Defendant then shifts course and moves to dismiss Count II, arguing that the claim for common law indemnification is precluded because "the parties have entered into a written contract which addresses the subject of indemnification[.]" Defs.' Br. 14.

Plaintiff responds that Defendant's gist-of-the-action defense is misplaced and that it has adequately pled a claim for breach of an express contract of indemnification. Plaintiff also takes the position that Defendant's arguments about the need for a C.O.M. and the running of the two-

year tort statute of limitations have been waived because they were not raised in Defendant's first motion to dismiss and, nevertheless, lack merit. Furthermore, according to Plaintiff, the filing of the Waiver of Liens was insufficient to discharge Defendant's obligations under the Agency Agreement, and neither did the change in the law with respect to mechanics' liens or Plaintiff's approval of the insurance commitment have the effect of excusing Defendant's alleged misconduct. Finally, Plaintiff argues that there is nothing which prohibits it from asserting an alternative count for common law indemnification, despite the existence of a provision in the Agency Agreement addressing indemnification.

## A.    Count I

The Court must first determine whether Count I sounds in contract, as Plaintiff alleges, or in tort, as Defendant claims, as the resolution of this question bears directly on the remaining arguments raised by Defendant. "The gist-of-the-action doctrine is a theory under common law 'designed to maintain the conceptual distinction between breach of contract claims and tort claims.'" *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 186 (3d Cir. 2015) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). It is designed to prevent a plaintiff from "attempt[ing] to frame a breach of contract claim as a tort claim" via "artful pleading." *Clark Motor Co. v. Mfrs. & Traders Trust Co.*, 360 F. App'x 340, 347 (3d Cir. 2010). "[T]he nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint," is the key "factor in determining whether the claim is truly one in tort, or for breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014). "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract – i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the

existence of the contract – then the claim is to be viewed as one for breach of contract." *Id.* (citations omitted). But if "the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and hence exists regardless of the contract, then it must be regarded as a tort." *Id.* (citations omitted).

In this case, Defendant's obligations were defined by the terms of the Agency Agreement. At bottom, Plaintiff alleges that Defendant breached several contractual duties – e.g., its duty to abide by the "usual and customary practices and procedures" in the industry, to apply "prudent underwriting principles," and to follow the "manuals, underwriting bulletins, and/or instructions" provided by Plaintiff – and is obligated to reimburse Plaintiff for losses arising therefrom under the indemnity provision in the Agency Agreement. Plaintiff further alleges that, to date, Defendant has refused to pay. This is quintessentially a claim for breach of contract. *See Williams v. Inflection Energy, LLC*, No. CIV.A. 4:15-00675, 2015 WL 4952626, at *4 (M.D. Pa. Aug. 19, 2015) (explaining that "a failure to indemnify after the indemnification provision has been triggered may lead to a party's breach of that contract"); *Fid. Nat'l Title Ins. Co. of N.Y. v. Crowley*, 35 N.E.3d 447, 2015 WL 4887598, at *2 (Mass. App. Ct. 2015) (explaining that similar claims based on identical agency agreement were "properly characterized as claims by a principal against an agent for breach of the parties' agency agreement and the enforcement of the express contractual indemnity agreement contained therein"). It makes no difference that Defendant's obligation to indemnify Plaintiff is triggered by "negligent, willful or reckless conduct" on Defendant's part. The parties could define the scope Plaintiff's right to indemnification under the Agreement with reference to such a standard without turning an action for indemnity under the Agreement into a tort action. *See Fid. Nat'l Title Co. v. Law Title Ins. Co.*, No. 04 C 6382, 2005 WL 1126899, at *13 (N.D. Ill. May 3, 2005) (concluding that a "claim

sound[ed] in breach of contract based on the terms of the insurance Agreement" even though the plaintiff had to prove fraud in order to recover under the Agreement).

Moving on, the Court will assume that Defendant's two remaining arguments – about the need for a C.O.M. and the expiration of the tort statute of limitations – have not been waived. Even if they have been properly raised in Defendant's second motion to dismiss, they lack merit.

First, under Pennsylvania law, a C.O.M. is required "[i]n any action based upon an allegation that a licensed professional deviated from an acceptable professional standard[.]" Pa. R.C.P. 1042.3. Plaintiff's allegations, which call into question whether Defendant's conduct met the applicable standard for professionals in a particular field (an issue on which expert testimony will likely be required), could plausibly come within the scope of Pa. R.C.P. 1042.3. *See Zokaites Contracting Inc. v. Trant Corp.*, 968 A.2d 1282, 1289 (Pa. Super. Ct. 2009) (explaining that a plaintiff cannot "circumvent the mandates of Pa. R.C.P. 1042.3, by simply recasting a negligence claim into a breach of contract claim, even though the averments in support of the contract claim fundamentally question the professional's exercise of due care"). However, title agents, though required to be licensed by the Pennsylvania Insurance Department, 40 P.S. § 910-24.1, are *not* included in the list of "licensed professionals" subject to the C.O.M. requirement, Pa. R.C.P. 1042.1(c). In addition, while some (or all) of the principals of B&G may be attorneys, Plaintiff has not alleged the existence of an attorney-client relationship and is not pursuing a claim for legal malpractice against them. Thus, that fact alone does not trigger the need for a C.O.M. *See, e.g.*, *Sabella v. Estate of Milides*, 992 A.2d 180, 187 (Pa. Super. Ct. 2010) ("If a complaint does not set forth a cause of action for legal malpractice, a certificate of merit is not required" although the defendant may be an attorney.); *Crowley*, 2015 WL 4887598, at *2 ("The fact that [the issuing agent] was an attorney and served as such vis-à-vis the mortgage lenders

does not transmute the claims into ones for legal malpractice.").

Second, because this is a claim for contractual indemnity, it is subject to Pennsylvania's four-year statute of limitations for breach of contract actions. *Lincoln Gen. Ins. Co. v. Kingsway Am. Agency, Inc.*, No. 1:11-CV-1127, 2013 WL 458449, at *3 (M.D. Pa. Feb. 6, 2013) (citing 42 Pa. C.S. § 5525(a)(8)). Such a claim "accrues when the indemnitee suffers actual loss or damage, generally by making an actual payment on behalf of the obligation of the indemnitor." *Ins. Comm'r of State of Conn. v. Novotny*, No. CIV.A 07-262 ERIE, 2009 WL 1653553, at *3 (W.D. Pa. June 11, 2009) (citations and quotations marks omitted). According to the Amended Complaint, the payments to the mechanics' lien claimants were made between July 7, 2011, and February 2013. Plaintiff's Complaint was filed on June 24, 2015 – less than four years after the claim for indemnification accrued. Therefore, this action is timely.[4]

In sum, Plaintiff has timely pled a claim to enforce the indemnity provision in the Agency Agreement, for which a C.O.M. is not required. While Defendant essentially invites the Court to condone its conduct and find that it discharged its obligations to Plaintiff by filing the Waiver of Liens and could not have foreseen the changes in the law that were on the horizon back in 2006, the Court cannot do so at this time. It may well be that Defendant's conduct did not fall short of the standard that was contemplated by the Agency Agreement, various provisions of which Plaintiff alleges have been breached. But at this early stage of the lawsuit, there is no evidence as to what that standard really was – for example, what constitutes the "usual and customary practices and procedures" and "prudent underwriting principles" – and whether the steps which

---

4. An argument could be made that Plaintiff's claim for breach of contract did not accrue until Defendant *refused* payment under the indemnity provision, which obviously would have come after the date when the payments were made. Though Pennsylvania law is unclear on this point, this position finds support in other jurisdictions. *See, e.g.*, *Old Republic Nat'l Title Ins. Co. v. Studstill & Perry, LLP*, No. 7:12-CV-83 HL, 2013 WL 1625123, at *3 (M.D. Ga. Apr. 15, 2013) (applying Georgia law); *First Am. Title Ins. Co. v. Res. Real Estate Servs., LLC*, No. CIV.A. 11 C 8095, 2012 WL 3245971, at *4 (N.D. Ill. Aug. 7, 2012) (applying Illinois law). Either way, however, Plaintiff timely filed this action.

Defendant took measured up. As a result, the Court cannot determine, as a matter of law or fact, whether the losses for which Fidelity seeks to be indemnified "resulted or arose from [Defendant's] negligent, willful or reckless conduct," as that phrase is defined in the Agency Agreement. Such a determination must await the conclusion of discovery, and Defendant's arguments on this issue are best reserved for a later stage of the litigation, once a record has been fully developed.[5] Thus, Defendant's motion to dismiss Count I will be denied.

**B.    Count II**

The parties disagree about whether Plaintiff may pursue a common law indemnification claim alongside its claim for contractual indemnity. Defendant says that such a claim is not viable because an express contract of indemnification exists. Plaintiff takes the opposite view, contending that Fed. R. Civ. P. 8(d)(2) permits this sort of alternative pleading. Each side has mustered case law that purportedly supports its respective position. *Compare* Def.'s Br. 14 (citing *Eazor Express Inc. v. Barkley*, 272 A.2d 893 (Pa. 1971)) *with* Pl.'s Br. 19 (citing *Quinones v. Upper Morland Twp.*, 187 F. Supp. 260 (E.D. Pa. 1960), *aff'd in part, rev'd in part on other grounds*, 293 F.2d 237 (3d Cir. 1961)).

---

5.      The Court does note, however, that there appears to be a real question whether Plaintiff is entitled to indemnification for the amounts paid in settlement of the claims made by Carpenters Combined Funds and Laborers Combined Funds. Defendant is correct that under the Pennsylvania Supreme Court holding in *Bricklayers of Western Pennsylvania Combined Funds, Inc. v. Scott's Development Co.*, the "union workers were not subcontractors, and the Trustees [of the Combined Funds], by corollary in their representative capacity, were not entitled to file a lien claim on the workers' behalf." 90 A.3d 682, 697 (Pa. 2014). Defendant is also correct in arguing in its reply brief (not in so many words) that a "party which settles claims and then seeks indemnification must be able to prove its liability and the reasonableness of its settlement payments." *Willard v. Interpool, Ltd.*, 758 A.2d 684, 688 (Pa. Super. Ct. 2000) (citing *Fox Park Corp. v. James Leasing Corp.*, 641 A.2d 315, 317 (Pa. Super. Ct. 1994)). This "principle[] appear[s] to apply regardless of whether the issue of indemnification arises in the context of a contractual provision or in the context of a claim based on common law equitable principles," though "the parties may agree to contract out of the actual liability requirement." *Casey ex rel. Casey v. Ryder Truck Rental, Inc.*, No. 00 CV 2856 (CLP), 2005 WL 1150228, at *8 (E.D.N.Y. May 16, 2005) (citing *Daily Express, Inc. v. Northern Neck Transfer Corp.*, 490 F. Supp. 1304, 1307 (M.D. Pa. 1980); *Volkswagen of Am., Inc. v. Bob Montgomery, Inc.*, No. 82 CV 3598, 1985 WL 2824, at *3 (E.D. Pa. Sept. 25, 1985)). Accordingly, if Plaintiff cannot show that it was actually liable to the Combined Funds or that the parties agreed to extend Plaintiff's right to indemnity to situations beyond that which is contemplated by Pennsylvania law, then Plaintiff cannot recover the amounts paid to settle these two claims. The Court reserves ruling on this issue at this juncture, however, since it has not been fully briefed by the parties.

In the Court's view, Defendant has the better side of this debate. As Defendant argues, the Pennsylvania Supreme Court has held that where "there is a written contract setting forth the rights and duties of the parties," the terms of the contract, rather than common law principles of indemnity, govern. *Eazor*, 272 A.2d at 895. The Third Circuit Court of Appeals is in agreement. *See Foster v. Pennsylvania R. Co.*, 201 F.2d 727, 731 (3d Cir. 1953). Thus, Plaintiff is entitled to indemnity under the Agency Agreement or it is not entitled to indemnity at all. It cannot seek to "enlarge upon or expand upon the express contractual provisions" by relying on the common law.[6] *Wyoming Johnson, Inc. v. Stag Indus., Inc.*, 662 P.2d 96, 102 (Wyo. 1983) (citing *Eazor*, 272 A.2d at 431).

To be sure, the Federal Rules of Civil Procedure do permit alternative pleading. And in certain circumstances, such as when there is some question about whether a contract exists or whether certain issues are covered by the contract, it might make sense to allow a plaintiff to pursue common law remedies alongside a claim for breach of contract. It does not, however, make sense when, as here, there is no dispute that the parties' Agreement covers the issue of indemnity. Under such circumstances, Plaintiff's claim must live or die under the terms of the Agreement, the terms of which the parties agreed would govern any disputes between them. *Cf. Boeynaems v. LA Fitness Int'l, LLC*, No. CIV.A. 10-2326, 2011 WL 4048512, at *22 (E.D. Pa. Sept. 12, 2011) (quoting *AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, Civ. A. No. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29, 2011)) (dismissing a claim for unjust enrichment because "neither party contest[ed] the validity of the Agreement, and 'any recovery

---

6.      In any event, it is not clear to the Court that Plaintiff's right to indemnity under common law would actually be any greater than its rights under the Agency Agreement. In either case, Plaintiff would have to establish that Defendant was negligent. *See Bank v. City of Philadelphia*, 991 F. Supp. 2d 523, 530 (E.D. Pa. 2014) (quoting *Morris v. Lenihan*, 192 F.R.D. 484, 488 (E.D. Pa. 2000) ("The common law right of indemnity 'enures [sic] to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable."). So in this sense, Plaintiff's common law claim seems superfluous.

would be determined on the basis of that contract alone'"). Therefore, Count II of the Amended Complaint will be dismissed.

**V.**     <u>**Conclusion**</u>

For the reasons hereinabove stated, Defendant's motion to dismiss will be **GRANTED IN PART** and **DENIED IN PART**. An appropriate order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**FIDELITY NATIONAL TITLE INSURANCE
COMPANY,**

**Plaintiff,**

**v.**

**B & G ABSTRACTORS, INC.,**

**Defendant.**

)
)
)
)  **2:15-cv-835**
)
)
)
)
)
)
)
)

**ORDER**

**AND NOW**, this 27th day of October, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant's MOTION TO DISMISS AMENDED COMPLAINT (ECF No. 18) is **GRANTED IN PART** and **DENIED IN PART**. Count II of the Amended Complaint is hereby **DISMISSED WITH PREJUDICE**. Defendant shall file an Answer to Count I of the Amended Complaint **on or before November 10, 2015**. The parties shall confer as necessary and file with the Court the Stipulation Selecting ADR Process and the Rule 26(f) Report **on or before November 24, 2015**. The Initial Case Management Conference is hereby **SCHEDULED** on **December 18, 2015, at 2:00 p.m.** in Courtroom 6C.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc:    **James A Willhite, Esq.**
       Email: james.willhite@fnf.com
       **Zachary J. Jones, Esq.**
       Email: zachary.jones@fnf.com
       **James W. Harvey, Esq.**

Email: jharvey@margolisedelstein.com
**Kyle T. McGee, Esq.**
Email: kmcgee@margolisedelstein.com